IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 1, 2022

## IN RE TRAVIONNA W. ET AL.[1]

**Appeal from the Juvenile Court for Shelby County**
**No. EE2379  Dan H. Michael, Judge**

————————————————————

### No. W2021-01349-COA-R3-PT

————————————————————

This appeal concerns the termination of a mother's parental rights to four of her children. The trial court found that the Tennessee Department of Children's Services ("DCS") established several grounds for terminating the mother's parental rights and that termination of her rights was in the children's best interests. On appeal, the mother contends that the trial court erred when it terminated her rights because the evidence is insufficient to prove any ground for termination or that termination of her parental rights is in the children's best interests. We have determined that DCS proved grounds for termination and that termination of the mother's parental rights was in the best interests of the children. Accordingly, we affirm the termination of the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which CARMA DENNIS MCGEE and KRISTI M. DAVIS, JJ., joined.

David J. Kreher, Cordova, Tennessee, for the appellant, Jerricka T.

Herbert H. Slatery III, Attorney General and Reporter, and Courtney J. Mohan, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Virginia R. Williams, guardian ad litem, Memphis, Tennessee, for the appellees, Travionna W., Travis W., Shirley W., and Rosemary W.

---

[1] This court has a policy of protecting the identity of children by initializing the last names of the parents and child.

# OPINION

## FACTS AND PROCEDURAL HISTORY

Travionna W., born in December 2010; Travis W., born in January 2012; Shirley W., born in July 2013; and Rosemary W., born in June 2015 (collectively, "the Children"), are the children of Jerricka T. ("Mother") and Travis W. Sr. ("Father").[2]

In June 2016, DCS received a referral that then five-year-old Travionna had been sexually abused by Vincent D., a non-relative. At the time of the alleged sexual assault, Mother was in jail and the Children were living with their maternal aunt; however, Mother was released shortly thereafter. Upon her release, Mother refused to believe that the abuse allegation was anything more than a lie and declined to allow Travionna to participate in a forensic interview. Moreover, although DCS had directed Mother to keep the Children away from Vincent D., the alleged perpetrator, Mother and the Children were later found to be living with him.

Believing the Children were subject to an immediate threat if they remained in the presence of Mother and the alleged perpetrator, DCS removed the Children from Mother's custody on August 29, 2016.[3] *See* Tenn. Code Ann. §§ 37-1-113 and -114 (authorizing the removal of a child when there is "an immediate threat to the child's health or safety"). DCS then promptly filed a dependency and neglect petition in the Juvenile Court of Shelby County. On September 1, 2016, the juvenile court issued an order bringing the Children into DCS custody nunc pro tunc to August 29, 2016.

In an order filed on September 20, 2019, the juvenile court found the Children were dependent and neglected due to, inter alia, "their exposure to drugs by [Mother]." In the same order, the court found Travionna was a victim of severe abuse perpetrated by Mother due to Mother's "failure to protect [Travionna] once she learned of the [sexual] abuse." As the juvenile court noted in its findings, "[N]either parent knew of the sexual assault prior to their incarceration, but . . . once [Mother] was released and knew of Travionna's disclosure[,] she moved the [C]hildren back to the home of [the perpetrator] and allowed him to care for them while she worked." Additionally, the juvenile court found that "[Mother] failed to cooperate with the Department and law enforcement's investigation at a critical time." Significantly, Mother did not appeal this order, and it became a final, non-

---

[2] Father's parental rights were terminated but only Mother appeals.

[3] DCS promptly placed the Children with a foster mother, Ms. J. The three girls—Travionna, Shirley, and Rosemary—remained in the physical custody of Ms. J. from their initial placement through the date of trial. Their brother Travis also resided in Ms. J.'s home until June 2020, when he was relocated due to behavioral issues. Thereafter, he was placed in three different foster homes before being placed in a residential treatment facility, where he was residing at the time of trial.

appealable judgment prior to the entry of the November 2021 order terminating Mother's parental rights.

Additionally, based on the finding of severe abuse, the juvenile court relieved DCS of its duty to exert reasonable efforts to reunite Mother and the Children. *See* Tenn. Code Ann. §§ 37-1-166(g)(1), (4)(A) and 36-1-102(9) (stating no reasonable efforts required if court finds parent committed severe child abuse).

*The Permanency Plans*

Shortly after DCS removed the Children from Mother's custody in August 2016, DCS assigned the case to Yutania Huffman, a DCS family services worker. During her time working with Mother, five different permanency plans were put in place. It is undisputed that Mother participated in the creation of each plan, attended the ratification hearing for each plan, and knew the tasks required under each plan.

At the time of the first plan, Ms. Huffman explained to Mother that her parental rights could be terminated if she failed to substantially comply with the plans. And the court informed Mother of the tasks required under each subsequent plan at the respective ratification hearings. Ms. Huffman also provided Mother with a copy of each plan.

The first plan was created in September 2016, shortly after the Children's removal. This first plan required Mother to (1) obtain stable housing, (2) complete an alcohol and drug assessment, (3) obtain a stable income, (4) complete parenting classes, and (5) participate in regular visits with the Children. At the ratification hearing, the court found Mother to be in substantial compliance with the first plan because she completed her parenting classes, completed the alcohol and drug assessment, was regularly visiting all of the Children, and had obtained steady employment.

The second plan was created in August 2017. Each of the tasks in the first plan was included in the second plan; however, the second plan also required Mother to (1) abstain from drug use, (2) participate in random drug screens, (3) attend regular meetings with her probation officer, and (4) pay fines that had been assessed to her. As with the first plan, the trial court found Mother was in substantial compliance with the second plan at the ratification hearing because she was continuing to visit the Children, see her probation officer, and participate in random drug screens. Although Mother complied with much of the second plan, Mother tested positive for cocaine three times in 2017.

The third plan was created in July 2018. Once again, Mother's tasks remained substantially the same as the first two plans, but the third plan also required Mother to (1) attend family counseling, (2) attend an outpatient drug treatment program, and (3) complete a mental health evaluation. Unlike previous ratification hearings, the court found Mother

was not substantially compliant with the third permanency plan because she was no longer trying to complete any of the tasks outlined in the plan.

The fourth plan, which was created in August 2019, was similar to the previous plans; however, because Mother admitted to regularly using cocaine, the fourth plan required her to attend an inpatient drug treatment program rather than an outpatient program. Once again, Mother was not in substantial compliance at the time of the ratification hearing because she was not attempting to complete the tasks outlined in the plan.

The fifth and final plan, which was created in September 2020, was substantially the same as the previous plans. As was the case with the most recent plans, Mother was substantially noncompliant because she failed to complete most of the tasks. In the interim, DCS had filed its petition to terminate Mother's parental rights.

*Termination Proceedings*

DCS filed its petition to terminate Mother and Father's parental rights on January 24, 2020.[4] In the petition, DCS sought termination on six grounds: severe child abuse, abandonment by failure to visit, abandonment by failure to support, substantial noncompliance with the permanency plans, failure to manifest an ability and willingness to assume custody of the Children, and persistence of conditions.

At the trial on January 29, 2021, the court heard testimony from Mother and Ms. Huffman and admitted several exhibits into evidence, including the judgment arising from the dependency and neglect action. In its final written order, entered on November 2, 2021, the court determined that DCS proved all six grounds and that termination of Mother's parental rights was in the Children's best interests.[5] Based on these findings, the court terminated Mother's parental rights. This appeal by Mother followed.

**ISSUES**

Mother presents two issues for our consideration, which we restate as follows:

---

[4] As noted earlier, Father's parental rights were terminated, but he did not appeal that ruling.

[5] The petition at issue was filed prior to April 22, 2021, at which time Tennessee Code Annotated § 36-1-113(i) identified nine factors for consideration. The statute was subsequently amended, and it now includes additional factors that should be considered, if relevant. *See* Act of April 22, 2021, 2021 Tenn. Pub. Acts ----, § 1 (effective April 22, 2021). Because the amended statute applies only to petitions for termination filed on or after April 22, 2021, the new factors do not apply to the present case. Accordingly, any reference to § 36-1-113(i) herein is to the version in effect when the petition was filed.

I.      Whether the trial court erred by finding that grounds were established to terminate Mother's parental rights.

II.     Whether the trial court erred by finding that termination of Mother's parental rights was in the best interests of the Children.

**STANDARD OF REVIEW**

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). "[T]his right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).

"To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citation omitted). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016).

In an appeal, "this [c]ourt is required 'to review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests.'" *In re Connor B.*, 603 S.W.3d 773, 779 (Tenn. Ct. App. 2020) (quoting *In re Carrington H.*, 483 S.W.3d at 525). In doing so, we must "determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). Stated another way, we must make our "own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524.

The trial court's findings of fact are reviewed de novo upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). Questions of law, however, are reviewed de novo with no presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524. A trial court's determinations regarding witness credibility are entitled to great weight on appeal and will not be disturbed "absent clear and convincing evidence to the contrary." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

## ANALYSIS

### I. GROUNDS FOR TERMINATION

The trial court found that DCS established six grounds for terminating Mother's parental rights: (1) severe child abuse, (2) abandonment by failure to visit, (3) abandonment by failure to support, (4) substantial noncompliance with the permanency plans, (5) persistence of conditions, and (6) failure to manifest an ability and willingness to assume custody of the Children. We will review each ground in turn.

### A. Severe Child Abuse

The ground of severe child abuse is established if the parent

> has been found to have committed severe child abuse, as defined in § 37-1-102, **under any prior order of a court** or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against **any child**.

Tenn. Code Ann. § 36-1-113(g)(4) (emphasis added). Severe abuse, as is relevant to this case, is defined as "[t]he commission of an act toward the child prohibited by . . . § 39-13-531 [aggravated rape of a child] . . . or the knowing failure to protect the child from the commission of such an act toward the child." *Id.* § 37-1-102(b)(27)(C).

The doctrine of res judicata "prevents a parent from re-litigating whether he or she committed severe child abuse when such a finding has been made in a previous dependency and neglect action." *In re S.S.*, No. E2021-00761-COA-R3-PT, 2022 WL 1151424, at *6 (Tenn. Ct. App. Apr. 19, 2022) (citing *In re I.E.A.*, 511 S.W.3d 507, 517 (Tenn. Ct. App. 2016)). As we have previously explained,

> The doctrine of res judicata applies when "an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction."

*In re Raylan W.*, No. M2020-00102-COA-R3-PT, 2020 WL 4919797, at *12 (Tenn. Ct. App. Aug. 20, 2020) (quoting *In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010)).

On February 27, 2018, in the dependency and neglect proceeding, the Juvenile Court for Shelby County found that Mother subjected Travionna to severe abuse by failing to protect her from the alleged perpetrator of her sexual abuse. Mother did not appeal that

order, and the finding of severe abuse in the dependency and neglect action became a final and non-appealable ruling prior to the entry of the trial court's final order in this action in November 2021. Therefore, the issue of severe child abuse is res judicata and cannot be relitigated. *See In re Collwynn J.*, No. E2020-00726-COA-R3-PT, 2020 WL 7319549, at *5–6 (Tenn. Ct. App. Dec. 11, 2020) (affirming ground based on res judicata finding of severe abuse); *accord In re Trinity S.*, No. E2021-00098-COA-R3-PT, 2021 WL 3486188, at *6 (Tenn. Ct. App. Aug. 9, 2021), *perm. app. denied* (Tenn. Oct. 18, 2021). Moreover, the juvenile court's severe-abuse finding in February 2018 satisfies the "under any prior order of a court" language in Tennessee Code Annotated § 36-1-113(g)(4).

In its final order, the trial court cited and correctly relied upon the juvenile court's February 27, 2018 order from the dependency and neglect proceeding to conclude that Mother subjected Travionna to severe abuse. Accordingly, we affirm the finding that DCS proved the ground of severe child abuse under Tennessee Code Annotated § 37-1-113(g)(4) and -102(b)(27)(C).

### B. Abandonment—Failure to Visit

Tennessee Code Annotated § 36-1-113(g)(1) establishes multiple grounds for termination based on abandonment as defined in Tennessee Code Annotated § 36-1-102. Tennessee Code Annotated § 36-1-102(1)(A)(i) provides that a parent will be deemed to have abandoned a child if,

> [f]or a period of four (4) consecutive months immediately preceding the filing of a [petition to terminate parental rights], . . . the parent or parents or the guardian or guardians either **have failed to visit** or have failed to support or have failed to make reasonable payments toward the support of the child.

(Emphasis added).

Tennessee Code Annotated § 36-1-102(1)(E) specifies that a failure to visit occurs when a parent, "for a period of four (4) consecutive months, [fails] to visit or engage in more than token visitation." "Token visitation" is defined as "visitation [that], under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." *Id.* § 36-1-102(1)(C).[6] Because the petition

---

[6] We recognize that a parent may establish an affirmative defense to abandonment by showing that any failure to visit was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I); *see also In re Kolton C.*, No. E2019-00736-COA-R3-PT, 2019 WL 6341042, at *5 (Tenn. Ct. App. Nov. 26, 2019) ("In 2018, the General Assembly amended the statute to shift the burden of proof to the parent or guardian to show that his or her failure to support or visit was not willful."). Though Mother's brief includes language regarding the application of this affirmative defense, Mother's brief does not contain any argument asserting that

- 7 -

to terminate Mother's rights was filed on January 24, 2020, the relevant four-month period is from September 24, 2019, through January 23, 2020.

Ms. Huffman testified that Mother had not visited with the Children since February 2019. Ms. Huffman further testified that Mother would regularly cancel the visits, which were arranged through Child and Family Team Meetings. While Mother testified that she visited with the Children at a Cici's Pizza restaurant within the relevant four-month period, the trial court found it significant that Mother later testified that this visit occurred after she began receiving unemployment benefits and that she did not begin receiving benefits until March 2020—a date outside of the relevant four-month period. For this and other reasons, the court found Mother's testimony to be inconsistent and expressly credited Ms. Huffman's testimony over that of Mother. Based on the foregoing, the trial court also found that DCS had clearly and convincingly established that Mother did not visit the Children in the four-month period immediately prior to the filing of the petition.

Significantly, the trial court found Mother's testimony to lack credibility and we give great deference to a trial court's credibility findings; we will not re-evaluate its assessment of witness credibility absent clear and convincing evidence to the contrary. *In re Arianna B.*, No. M2021-00980-COA-R3-PT, 2022 WL 1486190, at *2 (Tenn. Ct. App. May 11, 2022) (citations omitted); *In re Adoption of A.M.H.*, 215 S.W.3d at 809. After a careful review of the record and giving deference to the trial court's determination of credibility, we affirm the trial court's determination that DCS proved by clear and convincing evidence that Mother abandoned the Children by failing to visit during the relevant four-month period.[7]

### C. Abandonment—Failure to Support

Tennessee Code Annotated § 36-1-112(g)(1) also establishes a ground for termination based on abandonment by failure to support as defined in Tennessee Code Annotated § 36-1-102.

Tennessee Code Annotated § 36-1-102(1)(D) specifies that a failure to support occurs when a parent has failed, "for a period of four (4) consecutive months, to provide monetary support or [has failed] to provide more than token payments toward the support of the child." "Token support" is defined as "support [that], under the circumstances of the

---

Mother's failure to visit was not willful. Thus, any consideration of the issue is waived. *See Sneed v. Bd. of Pro. Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010) ("[W]here a party fails to develop an argument in support of his or her contention . . . , the issue is waived.").

[7] In her brief, Mother argues that Facebook photos show that she had, in fact, visited with the Children on January 7, 2020; however, we may not consider the Facebook photos because they were not admitted into evidence. Moreover, as the trial court noted, the dates on the Facebook photos merely show the dates that the photos were uploaded, not the dates the photos were taken.

individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). The fact that "the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period." *Id.* § 36-1-102(1)(D).

As noted immediately above, because the petition to terminate Mother's rights was filed on January 24, 2020, the relevant four-month period is from September 24, 2019, through January 23, 2020. Ms. Huffman testified that Mother did not provide any financial support or other gifts for the Children during this period.

Mother testified that she was employed through Supreme Staffing until the COVID-19 pandemic began, which would have been during the relevant four-month period, yet there is no evidence that she provided any support for the Children during the relevant period.[8] In its final order, the trial court found it significant that, despite testifying that she was employed prior to the pandemic, Mother could not provide an explanation as to why she did not provide any monetary support for the Children in the relevant four-month period between September 2019 and January 2020.

Mother also asserted that she gave each child $20 during the visit to Cici's Pizza. As previously discussed, however, Mother testified that the visit at Cici's Pizza occurred while she was receiving unemployment benefits, which Mother testified did not begin until after the relevant four-month period. Moreover, as with the previous ground, the trial court found inconsistencies in Mother's testimony and ultimately stated that it found Ms. Huffman's testimony more credible than Mother's. Further, the $20 gifts were so insignificant they would not constitute support because they were merely token. *See* Tenn. Code Ann. § 36-1-102(1)(B) ("Token support" is defined as "support [that], under the circumstances of the individual case, is insignificant given the parent's means.").

After careful review of the record and considering the deference we must give to the trial court's credibility determination, we agree with the trial court that the evidence clearly and convincingly establishes the ground of abandonment by failure to support. Accordingly, we affirm this finding.

D. Substantial Noncompliance with the Permanency Plans

Tennessee Code Annotated § 36-1-113(g)(2) provides that a parent's rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan."

---

[8] After she lost her job when the pandemic began, Mother began receiving $400 per week in unemployment benefits in March 2020.

Noncompliance with a permanency plan may be grounds for termination only "if the court finds the parent was informed of [the plan's] contents, and that the requirements . . . [were] reasonable and [were] related to remedying the conditions that necessitate[d] foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C); *see In re Valentine*, 79 S.W.3d at 547. "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. Whether a parent's noncompliance is substantial depends on "the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citations omitted).

As mentioned above, five permanency plans were created for Mother on the following dates: September 29, 2016; August 30, 2017; July 31, 2018; August 27, 2019; and September 3, 2020. Though the goals of the plans changed over time, the tasks generally remained the same. The plans required Mother to (1) visit the Children; (2) obtain and maintain stable housing; (3) obtain a legal source of income; (4) complete parenting classes; (5) complete an alcohol and drug assessment; (6) abstain from drug use; (7) participate in random drug screens; (8) attend regular meetings with her probation officer; (9) pay fines that had been assessed to her; (10) attend family counseling; (11) attend an outpatient drug treatment program; (12) complete a mental health evaluation; and (13) attend an inpatient drug program. While the juvenile court found Mother was in substantial compliance with the first two permanency plans when it ratified them in 2016 and 2017, respectively, the juvenile court found that Mother was not in substantial compliance with the other permanency plans at the time of ratification in 2018, 2019, and 2020.

We begin our analysis of this issue by noting that the trial court determined that the requirements of the permanency plan were reasonable and related to remedying the conditions that caused the Children to be removed from Mother's custody, and we agree with that finding. *See In re Valentine*, 79 S.W.3d at 547.

At trial, Mother testified that she was aware of the contents of each plan and that she was aware of the possible consequences of not substantially complying with the plans. Mother went on to state that she had complied with many of the tasks outlined in the permanency plans and that she was capable of taking care of the Children. Mother also testified that she was unemployed and living with her mother in Arkansas. Mother also testified that her mother's home was a four-bedroom home that she shared with her mother and two sisters. Mother went on to state that, because of space constraints in the home, she shared a single bedroom with her two youngest children, both of whom were born after the Children were removed from Mother in August 2016.

The trial court relieved DCS of the duty to make reasonable efforts to assist Mother in complying with the requirements of the permanency plans based on its finding of severe abuse in the dependency and neglect action. *See* Tenn. Code Ann. §§ 37-1-166(g)(1), (4)(A) and 36-1-102(9). Nevertheless, Ms. Huffman testified that she assisted Mother by

offering bus passes, providing her with transportation, helping her look for jobs, and helping her enroll in a program to obtain suitable housing. Nevertheless, Ms. Huffman also stated that Mother had failed to substantially comply with the permanency plans in numerous ways. Ms. Huffman testified that Mother had completed three requirements of the first plan by completing parenting classes, visiting the Children, and maintaining legal income. Ms. Huffman also testified that Mother completed three tasks under the second plan by completing random drug testing, meeting with her probation officer, and visiting the Children. Ms. Huffman went on to state that Mother did not complete any of the requirements of the third plan. With regard to the fourth plan, Ms. Huffman stated that Mother had a visit with the Children in October 2020, but Mother had not completed any of the other requirements. Finally, Ms. Huffman testified that Mother failed to comply with the requirements of the fifth and final plan because she had not provided DCS with evidence of stable income or housing, had not completed the inpatient drug program, had not provided DCS with any clean drug screens, had not completed the mental health assessment, and had not consistently visited the Children.

We note that the fourth plan was created in August 2019 with an expected completion date in August 2020, and the fifth plan was created in September 2020 with an expected completion date in September 2021. Significantly, however, DCS filed its petition to terminate Mother's parental rights in January 2020, well before the expected completion date of the fourth plan and before the fifth plan was created. Thus, Mother was deprived of the time allocated for her to complete the fourth and fifth plans. This is significant because in *In re Nakayia S.*, No. M2017-01694-COA-R3-PT, 2018 WL 4462651 (Tenn. Ct. App. Sept. 18, 2018) we reversed the finding of substantial-noncompliance when the petition was filed before the expected achievement date in the operative plan. *Id.* at *4–5. Similarly, in *In re Dyllon M.*, No. E2020-00477-COA-R3-PT, 2020 WL 6780268 (Tenn. Ct. App. Nov. 18, 2020) we noted that "[i]t would be fundamentally unfair for DCS to file a petition to terminate [a parent's] parental rights based on [the parent's] failure to act under a permanency plan *before* the trial court ratified the plan and *before* the date by which [the parent] was required to act." *Id.* at *7 n.7; *see also In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, *14 (Tenn. Ct. App. June 30, 2005) (noting concern about moving to terminate a parent's rights "well short of the time allowed by the Permanency Plan . . . absent extraordinary circumstances"), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). Thus, we will not consider Mother's alleged noncompliance with the fourth or fifth plan.

Nevertheless, the trial court made the express finding that Mother did not complete any of the requirements of the third plan, for which the anticipated completion date expired prior to the filing of the termination petition. Further, it is significant that the trial court made the express findings that Mother made no attempt to complete the third plan and she was still not able to provide clean drug tests, which was a substantial and material goal to be achieved.

Thus, excluding Mother's alleged noncompliance with the fourth and fifth plans while considering the importance of the particular requirements of the third plan that Mother had not met or attempted, *see In re M.J.B.*, 140 S.W.3d at 656, we affirm the trial court's ruling that the evidence clearly and convincingly established the ground of substantial noncompliance with the permanency plans.

## E. Persistence of Conditions

Under Tennessee Code Annotated § 36-1-113(g)(3), parental rights may be terminated when the child has been removed from the parent's custody during dependency and neglect proceedings for six months and three factors exist:

>  (i)    The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

>  (ii)   There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

>  (iii)  The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home . . . .[9]

The purpose of this ground is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). As we have recognized, "[a] parent's continued inability to provide fundamental care to a child . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (quoting *In re A.R.*, 2008 WL 4613576, at *20). Further, "[w]here . . . efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* (quoting *In re A.R.*, 2008 WL 4613576, at *20).

---

[9] Tennessee Code Annotated section 36-1-113(g)(3) requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550.

As a threshold matter, we recognize that the Children were declared dependent and neglected on February 27, 2018, after the trial court determined that Mother had exposed the Children to drugs and that Mother had failed to protect Travionna from sexual abuse. Moreover, the court removed the Children from Mother's custody in August 2016; thus, they had been in DCS's custody for more than six months prior to the filing of the petition in January 2020.

Regarding the first factor, the trial court found that the conditions which led to the Children's removal still persisted and, in all reasonable probability, would cause the Children to be subjected to further abuse and neglect. In its final order, the trial court determined that Mother was still unable to provide the Children with suitable housing and that she had not remained drug-free.

Regarding the second factor, the trial court determined that Mother could not remedy the conditions at an early date such that the Children could be safely returned to her care. In doing so, the trial court emphasized that Mother had not maintained a relationship with the Children, Mother had an active warrant out for her arrest, Mother did not have suitable housing, Mother had not shown recent clean drug screens, and Mother could not provide proof of income. Moreover, the trial court relied on the testimony of Ms. Huffman to find that it was not likely the Children could be returned to Mother in the near future because Mother had an active arrest warrant and because she had been unable to show that she could remain sober and maintain a safe home throughout the four-year custodial episode.

Finally, regarding the third factor, the trial court found that continuation of the parent-child relationship would greatly diminish the Children's chances of early integration into a safe and stable home. At the time of trial, three of the Children lived in a foster home. Though the foster parent, Ms. J., had expressed some concerns about the Children's behavior to Ms. Huffman, Ms. Huffman testified that Ms. J. intends to remain a supportive foster parent to the girls, that the Children had continued to express a desire to remain with Ms. J., and that Ms. J. was providing the three girls with stability. Significantly, Ms. Huffman also testified that Travis had been diagnosed with previously untreated mental health disorders and that he was currently receiving necessary residential treatment at a facility in Georgia. Similarly, Travionna and Shirley are also receiving the necessary treatment for mental health issues while in foster care.

For these reasons, and after a careful review of the record, we agree with the trial court that DCS has proved the ground of persistence of conditions by clear and convincing evidence. Accordingly, we affirm.

### F. Failure to Manifest an Ability and Willingness

A court may terminate a parent's rights if the parent (1) "failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or

financial responsibility of the child" and (2) "placing the child in the [parent]'s legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14).

In construing this statute, the Tennessee Supreme Court has "held that the first prong requires clear and convincing proof that the parent 'has failed to manifest <u>either</u> ability or willingness' to assume custody of or responsibility for the child." *In re Manning H.*, No. M2020-00663-COA-R3-PT, 2021 WL 2935047, at *6 (Tenn. Ct. App. July 13, 2021) (quoting *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020)). In order to satisfy the second prong, DCS must show "clear and convincing proof that placing the child in the parent's physical custody would likely cause substantial harm." *Id.* at *6. Though the statute does not specifically define "substantial harm," this court has construed it to require evidence of "a real hazard or danger that is not minor, trivial, or insignificant." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001).

Here, the trial court, relying on Ms. Huffman's testimony, found that both factors were present. The trial court found it significant that Mother has not maintained regular visitation with the Children, has not maintained a relationship with the Children, has "repeatedly broke promises to [the Children]," and has failed to show that she can maintain a stable home. The trial court also highlighted Mother's failure to show that she could live a drug-free lifestyle. Finally, the trial court found that returning the Children to Mother's custody would pose a risk of substantial harm because Mother had not acknowledged the harm that she had caused the Children, had continued to use drugs, had not shown that she could consistently parent the Children, and had not shown that she could meet the emotional, mental, or physical needs of the Children.

After careful review of the record, we agree with the trial court that DCS has proved the ground of failure to manifest an ability or willingness to assume custody by clear and convincing evidence. Accordingly, we affirm the trial court on this ground.

II. BEST INTEREST ANALYSIS

Mother contends the trial court erred by finding that it was in the Children's best interests to terminate her parental rights. More specifically, she contends that termination of her parental rights is not in the Children's best interests because she "has had and continues to have, [through] family, a safe, [stable] home for her children." Mother also argues that she has maintained regular communication with the Children and has demonstrated a lasting adjustment of circumstances.

Tennessee Code Annotated § 36-1-113(i) identifies several factors to be considered when analyzing whether termination of parental rights is in a child's best interest; however, these "factors are illustrative, not exclusive," and the parties are free to offer proof of any

- 14 -

other relevant factor to the analysis.[10] *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In *In re Gabriella D.*, the Tennessee Supreme Court summarized the law pertaining to this analysis:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ."
>
> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

531 S.W.3d at 681–82 (citations omitted).

The trial court set forth findings of fact regarding the factors it deemed applicable, and we review those findings below.

## A. Adjustment of Circumstance

---

[10] The petition at issue was filed prior to April 22, 2021, at which time Tennessee Code Annotated § 36-1-113(i) identified nine factors for consideration. The statute was subsequently amended and it now includes additional factors that should be considered, if relevant. *See* Act of April 22, 2021, 2021 Tenn. Pub. Acts ----, § 1 (effective April 22, 2021). Because the amended statute applies only to petitions for termination filed on or after April 22, 2021, the new factors do not apply to the present case. Accordingly, any citation to § 36-1-113(i) herein is to the version in effect when the petition was filed.

The first factor considered by the trial court was "[w]hether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent." Tenn. Code Ann. § 36-1-113(i)(1).

The trial court found that, at the time of trial, Mother had an active warrant out for her arrest, that she had failed to submit clean drug screens, and that she did not have stable housing. For these reasons, the trial court found that this factor weighed in favor of terminating Mother's rights.

Mother admitted that there was an active warrant out for her arrest. Additionally, Ms. Huffman testified that Mother had failed to provide DCS with clean drug screens and that she tested positive for cocaine just a few months before trial. Finally, while Mother insists that she has stable housing, Mother testified that she was living in a four-bedroom home that she shared with her mother, her two sisters, and her two other children. Mother also explained that she was living with her two other children in one of the home's bedrooms. Significantly, however, Mother did not explain how a single bedroom could sufficiently accommodate her, her two youngest children, and the four children involved in this matter.

Having determined that the evidence does not preponderate against these findings, we agree with the trial court that this factor weighs in favor of terminating Mother's parental rights.

## B. Regular Visitation or Contact

The second factor considered by the trial court was "[w]hether the parent . . . has maintained regular visitation or other contact with the child." Tenn. Code Ann. § 36-1-113(i)(3).

The trial court found that Mother had failed to regularly visit the Children. In doing so, the trial court found it significant that both Ms. Huffman and Mother testified that visitation had been inconsistent throughout much of the custodial episode. The trial court also noted that Mother could not recall the last time she visited with the three girls and agreed that it had been over a year since she had last seen Travis. Moreover, Ms. Huffman testified that Mother regularly canceled planned visits and that Mother's last visit with the Children was nearly a year before DCS filed the petition.

Having determined that the evidence does not preponderate against this finding, we agree with the trial court that this factor weighs in favor of terminating Mother's parental rights.

## C. Meaningful Relationship

The third factor considered by the trial court was "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." Tenn. Code Ann. § 36-1-113(i)(4).

The trial court found that Mother had failed to maintain any meaningful relationship with the Children. This finding was based on Ms. Huffman's testimony, which demonstrated the Children did not have "a significant bond with [Mother]." Specifically, Ms. Huffman's testimony established that Travis "is fine whether or not he sees his mother, that Travionna cannot stand her mother, that Shirley is open to seeing her mom but doesn't want to live with her, and that Rosemary loves her mom but wants to live with her foster parent."

Having determined that the evidence does not preponderate against this finding, we agree with the trial court that this factor weighs in favor of terminating Mother's parental rights.

### D. Change of Caretakers and Physical Environment

The fourth factor considered by the trial court was "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition." Tenn. Code Ann. § 36-1-113(i)(5).

The trial court found that any change in caretakers would likely have a detrimental effect on the Children's emotional, psychological, and medical condition. In its final order, the court highlighted that the three girls had bonded with their foster parent, Ms. J. The trial court went on to state that, while it was troubled by the fact that Ms. J. does not wish to adopt the Children, Ms. J. has remained "a consistent figure in their lives since 2016," and "that there was no testimony that she intends to kick the [C]hildren out of her home." For these reasons, the trial court determined that "changing caregivers in this stage would greatly affect the child emotionally, psychologically, and physically."

It is undisputed that the Children were in DCS's custody for approximately four years, and that the conditions which led to their removal still existed at the time of trial. Moreover, testimony established that Ms. J. could provide the three girls with a safe and stable home while they await adoption. Finally, testimony established that the Children were receiving the necessary care to deal with various mental health issues. In this regard, Ms. Huffman testified she was concerned that the Children would not continue to receive the mental health care they required should their caretakers change.

Having determined that the evidence does not preponderate against these findings, we agree with the trial court that this factor weighs in favor of terminating Mother's parental rights.

### E. Abusive Behavior

The fifth factor considered by the trial court was "[w]hether the parent . . . or other person residing with the parent . . . has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household." Tenn. Code Ann. § 36-1-113(i)(6).

The trial court found that Mother had committed severe child abuse toward Travionna, as evidenced by the prior severe-abuse finding. As previously discussed, Mother was found to have severely abused Travionna during the prior dependency and neglect proceedings for failing to protect her from significant bodily injury.

Having determined that the evidence does not preponderate against this finding, we agree with the trial court that this factor weighs in favor of terminating Mother's parental rights.

## F. Physical Environment of Parent's Home

The sixth factor considered by the trial court was

> [w]hether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent . . . consistently unable to care for the child in a safe and stable manner.

Tenn. Code Ann. § 36-1-113(i)(7).

Regarding this factor, the trial court explained that Mother's "home environment is unhealthy and unsafe." The court based its finding on the fact that Mother's use of drugs has "rendered her consistently unable to care for the [C]hildren in a safe and stable manner." The trial court also found it significant that Mother admitted to using drugs in the time leading up to trial and that Mother had not provided clean drug screens. Further, the court recognized that Mother has an active warrant out for her arrest. For these reasons, the trial court concluded that Mother could not provide a stable home for the Children.

After careful review of the record, we find that the evidence contained in the record does not preponderate against these findings, and we agree with the trial court that this factor weighs in favor of termination.

## G. Child Support

The seventh factor considered by the trial court was "[w]hether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101." Tenn. Code Ann. § 36-1-113(i)(9).

The trial court found that Mother failed to pay child support consistent with the child support guidelines. Testimony established, and the trial court found, that Mother had not paid child support for the Children since they entered foster care in August 2016. While Mother testified that she had given the Children $20 at a visit to Cici's Pizza, Mother's own testimony regarding her unemployment payments established that this visit took place nearly four years into the Children's custodial episode.

Having determined that the evidence does not preponderate against these findings, we agree with the trial court that this factor weighs in favor of terminating Mother's parental rights.

## H. Other Relevant Factors

Tennessee Code Annotated § 36-1-113(i) clarifies that a trial court is not bound to consider only the enumerated best interest factors contained in the statute. To the contrary, Tennessee Code Annotated § 36-1-113(i) states, "in determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, **but is not limited to**, the following." (emphasis added). After recognizing this section, the trial court went on to find:

> [T]he [C]hildren's most stable figure has been the foster parent since they entered into custody in 2016. [Father and Mother] have broken multiple promises to the [C]hildren, they have not been consistent with their attempts to safely parent these emotionally fragile children, and they have not shown they fully understand the trauma the [C]hildren have been th[r]ough. Travis, age nine, has been in and out of Lakeside as he has threatened to kill himself, his siblings, and his foster parent. He jumped out of a moving car at one point and at another he threatened multiple people with garden shears. He is diagnosed with post-traumatic stress disorder, attention deficit hyperactivity disorder, oppositional defiant disorder, and bipolar disorder. Travis has not consistently communicated with his parents since he entered into Inner Harbor in January 2021 and Ms. Huffman testified he is fine with that lack of contact. Travionna, age ten, also has serious issues. She has threatened to kill herself and others since she entered into foster care in 2017. Last month, she threatened to poison the foster parent, she visits inappropriate websites, and she hits peers and staff at school and home. She is upset about how her mother handled the sex abuse, she does not want to speak with her mother, and she does not want to reside with her mother. She is diagnosed with attention deficit hyperactivity disorder and oppositional defiant disorder. She attends regular counseling and has coping skills but she will not use them. . . . She does not want to reside with either parent. Shirley, age eight, just left Lakeside for the first time. In July, she turned all the gas burners on the stove on while the family was outside and threatened to kill her foster

parent and her siblings. When the foster parent caught her, she said she wanted to "blow the house up," ran and locked herself in a room, and tried to burn the house down. She is diagnosed with attention deficit hyperactivity disorder and has recently started counselling. She does not want to live with her mother or father. She wants to stay with her foster parent. Rosemary, age six, is doing the best of all the [C]hildren. She loves her parents but she wants to remain in the foster home. She has normal age-appropriate tantrums. She is upset that her mother has recently had a new child.

For these additional reasons, the trial court found that it was in the Children's best interests to terminate Mother's parental rights. Having found that the testimony contained in the record supports these findings, we agree with the trial court that these additional facts weigh in favor of terminating Mother's parental rights.

Based on the factual findings set forth above, and considering the combined weight of those facts, we conclude, as the trial court did, that the proof amounts to clear and convincing evidence that termination of Mother's rights is in the Children's best interests. *See In re Gabriella D.*, 531 S.W.3d at 681. Accordingly, we affirm the trial court's determination that termination of Mother's parental rights is in the Children's best interests.

## IN CONCLUSION

Having affirmed the trial court's findings that grounds exist for terminating the parental rights of Mother and that termination of her parental rights is in the best interest of Travis, Travionna, Shirley, and Rosemary, we affirm the termination of the parental rights of Mother. Costs of appeal are assessed against the appellant, Jerricka T.

_____
FRANK G. CLEMENT JR., P.J., M.S.